NUMBER 13-09-00552-CV

                                                                                                          

COURT OF APPEALS

 

THIRTEENTH DISTRICT OF TEXAS

 

CORPUS CHRISTI - EDINBURG  

                                                                                                                     


 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



MADAHAVAN PISHARODI,
M.D.,

P.A., D/B/A PISHARODI
CLINIC,                                                 Appellant,

 

v.

 

MARIO SALDANA, NANCY
LAMAS,

AND JESUS LAMAS,                                                                    Appellees.

                                                                                                                                     


 



On appeal from the 445th District
Court

 of Cameron County, Texas.

 

 



MEMORANDUM OPINION  

 

Before Chief Justice Valdez and
Justices Yañez and Vela[1]

Memorandum Opinion by Chief Justice
Valdez

 

            In this interlocutory appeal, appellant,
Madhaven Pisharodi, M.D., P.A. d/b/a Pisharodi Clinic, appeals from the trial
court’s denial of his motion challenging the expert report and requesting
dismissal of a health care liability lawsuit brought by appellees, Mario
Saldaña, Nancy Lamas, and Jesus Lamas.  See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (Vernon
2008).  By two issues, Dr. Pisharodi contends that the expert report relied
upon facts that do not exist and never identified the proper standard of care.[2]  We affirm.

I.          Background

            Dr. Pisharodi, a neurosurgeon, gave Micaela
Lamas an epidural steroid injection in her lower back.  Subsequently, Lamas
died after suffering cardiac arrest in Dr. Pisharodi’s office.  Appellees,
Lamas’s children, filed suit against Dr. Pisharodi claiming that his negligent
acts caused Lamas’s death.  In his answer to appellees’ petition, Dr. Pisharodi
denied any negligence and claimed that Lamas’s death was caused by the
intervening acts of Alejandro Betancourt, M.D.

            Appellees filed a medical expert report and a
supplemental expert report generated by Stephanie S. Jones, M.D., an
anesthesiologist.  Dr. Jones stated that she reviewed Lamas’s autopsy report,
Dr. Pisharodi’s office notes, the emergency medical services (“EMS”) ambulance
activity report, and medical records from South Texas Rehab Hospital, Valley
Regional Medical Center, and Valley Baptist Hospital.

            In her expert report, Dr. Jones set out that
Lamas had been diagnosed with a large L1-2 lumbar disc herniation.  According
to Dr. Jones, Dr. Pisharodi performed two spinal injections on Lamas.  The
first time Dr. Pisharodi administered the morphine into Lamas’s spine, she did
not have an adverse reaction.  According to Dr. Jones, Dr. Pisharodi had given
Lamas an epidural steroid injection “without fluoroscopy” using a local
anesthetic.[3] 
Dr. Jones stated that Dr. Pisharodi performed the injection in his office “and
documented that he injected 5 cc of 0.5% bupivacaine into the neuroaxial region
with 4 mg of (presumably) epidural morphine.”  Dr. Jones noted due to the
“amount of local anesthetic and neuroaxial opiates” injected in Lamas’s spine,
it was outside of the standard of care to perform the procedure in Dr.
Pisharodi’s office.  Dr. Jones stated that after the first spinal injection did
not reduce Lamas’s pain, Lamas had “spine surgery” but eventually suffered
increasing back pain.  Dr. Jones stated:

Dr. Pisharodi felt that [Lamas’s] back pain was due to
muscle spasms, but in the same sentence also reported that he felt an epidural
“pain block” was the cure.  In [Dr. Pisharodi’s] request for such an injection,
he reported that he expected “immediate relief” because he was injecting an
“anti-inflammatory” (Depo-Medrol typically takes more than two days to take
effect) and “pain medications.”  Unfortunately, he was given authorization to
do this procedure and this was done on October 29, 2007.[[4]]  In the procedure
note, he reported that he injected “4 cc of Marcaine and 2 cc of morphine[.]” 
There is no mention of the strength of the Marcaine or the milligram dosage of
the Duramorph.  The patient was taken to the recovery area at approximately
10:20 in the morning and reported as being stable.  Her vital signs reflected
this.  At 11:05, she [Lamas] became nauseated, restless and diaphoretic with a
recorded blood pressure of 140/88, respirations 22, oxygen saturation 96%.  EMS
was called at 11:05 and by 11:15 [Lamas] had collapsed without a pulse and CPR
was reportedly started.  The last recorded vital signs per the person recording
them was 135/90, pulse 90, respirations 24.  EMS arrived somewhere around 11:20
in the morning and they documented pupils fixed and un-reactive meiosis due to
opiate overdose as well as what they felt to be inadequate bag valve mask
ventilation (they were not able to auscultate breath sounds on the patient while
the mask ventilation was being done).  Fortunately, they intubated the patient and
on the way to the hospital, they were able to obtain a cardiac rhythm.  [Lamas]
was also given atropine and epinephrine.  [Lamas] was taken to Valley Regional
Medical Center and the admitting diagnosis was anaphylaxis.  She developed
seizures felt secondary to anoxic brain injury.  Dr. Pisharodi was dismissed
from care of the patient by the family and her care was taken over by [Dr.
Betancourt].

 

Dr. Jones noted that after several days, Lamas’s family
allowed the removal of the ventilator, and she died.

            Based on the autopsy report, the timing of the
spinal injection, Lamas’s symptoms, and the EMS’s report, Dr. Jones disagreed
with the diagnosis of anaphylaxis due to morphine and believed that Lamas
suffered an overdose.  Dr. Jones opined that “[a]t minimum” fluoroscopic
guidance was required for this procedure, and without fluoroscopy, Dr.
Pisharodi could not verify that the anesthetic and morphine were not injected
into Lamas’s spinal fluid.  Dr. Jones stated that Dr. Pisharodi was negligent
and went outside the standard of care when he performed the procedure with “the
amounts of local anesthetic and neur[o]axial opiates that he was giving in his
office.”  Dr. Jones explained that Dr. Pisharodi should have put Lamas on an IV
in order to provide adequate resuscitation, if necessary.  Dr. Jones stated
that she believed that the combination of the medication Dr. Pisharodi injected
into the spine, the lack of a fluoroscopy to verify placement of such a large
dose of local anesthetic and morphine, and an inability to provide rapid
resuscitation led to Lamas’s death.  Dr. Jones stated:

At MINIMUM these guidelines should have also been applied
in the setting in which he placed [Lamas] in accordance with the standard of
care.

 

            #1)  Monitoring for respiratory depression
every 1hr for 12 hrs and   then every 2hrs for 12hrs.

 

            #2)  IV access during the time of monitoring
to allow for reversal      agent             administration if necessary.

 

            #3)  Administration of reversal agent (eg
Narcan) to all patients        experiencing             significant respiratory
depression after spinal opioid    administration.

 

            In her supplemental expert report, Dr. Jones opined
that anaphylaxis is not an “appropriate” diagnosis in this case because of the
state of Lamas’s pupils as documented by EMS personnel.  According to Dr.
Jones, the EMS report documented that Lamas’s pupils were “fixed and meiotic
(i.e., pinpoint in size) and not dilated as you would expect in cardiopulmonary
arrest from an allergic reaction.  Opiates cause very small pupils and it is
something classically looked for in opiate overdose.”  Dr. Jones further stated
that Dr. Pisharodi violated the accepted guidelines for administering spinal
morphine and that he should not have performed the procedure in his office.

            Dr. Pisharodi objected to appellees’ expert
report and asked the trial court to strike it and dismiss appellees’ lawsuit. 
The trial court denied Dr. Pisharodi’s request.  This interlocutory appeal
ensued.  See Tex. Civ. Prac.
& Rem. Code Ann. § 51.04(a)(9) (Vernon 2008).

II.         Standard of Review and Applicable
Law

            We review a trial court’s ruling on a motion to
dismiss a health care liability claim for an abuse of discretion.  Valley
Baptist Med. Ctr. v. Azua, 198 S.W.3d 810, 815 (Tex. App.–Corpus Christi
2006, no pet.) (citing Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52
(Tex. 2002) (per curiam)).  A trial court abuses its discretion when it acts “‘without
reference to any guiding rules or principles’ or, stated another way, when the
trial court acts in an arbitrary and unreasonable manner.”  City of San
Benito v. Rio Grande Valley Gas Co., 109 S.W.3d 750, 757 (Tex. 2003)
(quoting Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 242 (Tex.
1985)).  We may not substitute our own judgment for that of the trial court when
reviewing matters committed to the trial court's discretion.  Bowie, 79
S.W.3d at 52.  A trial court does not abuse its discretion merely because it
decides a discretionary matter differently than the appellate court would in a
similar circumstance.  Downer, 701 S.W.2d at 242.

Section 74.351(r)(6) requires that
an expert report provide a fair summary of the expert’s opinions regarding
applicable standards of care, the manner in which the care rendered by the
defendant failed to meet the standards, and the causal relationship between
that failure and the injury, harm, or damages claimed.  Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) (Vernon 2005);
Bowie, 79 S.W.3d at 52; Am. Transitional Care Ctrs. of Tex., Inc. v.
Palacios, 46 S.W.3d 873, 878 (Tex. 2001).  An expert report constitutes a
good faith effort if it:  (1) informs the defendant of the specific conduct the
plaintiff has called into question; and (2) provides a basis for the trial
court to conclude that the claims have merit.  Palacios, 46 S.W.3d at
879.  “The report need not marshal all the plaintiff’s proof, but it must
include the expert’s opinion on each of the three elements that [section 74.351(r)(6)]
identifies:  standard of care, breach, and causal relationship.”  Bowie,
79 S.W.3d at 52.  A report merely stating the expert’s conclusions about the
standard of care, breach, and causation does not represent a good faith effort.
 Palacios, 46 S.W.3d at 879.  “‘Rather, the expert must explain the
basis of his statements to link his conclusions to the facts.’”  Bowie,
79 S.W.3d at 52 (quoting Earle v. Ratliff, 998 S.W.2d 882, 890 (Tex.
1999)).

            If, after a hearing, it appears to the trial court
that the expert report does not represent an objective good faith effort to
comply with subsection 74.351(r)(6), it shall grant a motion challenging the
adequacy of the expert report.  Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(l); Bowie, 79
S.W.3d at 51-52.  “The trial court should look no further than the report
itself, because all the information relevant to the inquiry is contained within
the document’s four corners.”  Bowie, 79 S.W.3d at 52.  Furthermore, “a
plaintiff need not present evidence in the report as if it were actually litigating
the merits.  The report can be informal in that the information in the report
does not have to meet the same requirements as the evidence offered in a
summary-judgment proceeding or at trial.”  Palacios, 46 S.W.3d at 879.

III.        Reliability of Dr. Jones’s Expert
Report

            By his first issue, Dr. Pisharodi contends that
Dr. Jones’s expert report is inadequate because she relied “upon facts that do
not exist.”  Specifically, Dr. Pisharodi argues that a defendant in a health
care liability lawsuit “should be permitted to demonstrate to a trial court that
the facts or data upon which a [section] 74.351 report is based are not true
and do not exist in order to challenge and strike a report” and that the trial
court in this case “should have reviewed the records provided.”  Dr. Pisharodi
urges this Court to review the medical records that Dr. Jones relied on and
conclude that the report is insufficient.

            We decline to review those medical records.  When
determining whether a good faith effort has been made, the trial court is
limited to the four corners of the report, and it cannot consider extrinsic
evidence.  Palacios, 46 S.W.3d at 878 (“Because the statute focuses on
what the report discusses, the only information relevant to the inquiry [of
whether the report represents a good faith effort] is within the four corners
of the document.”); see also Doctors Hosp. v. Hernandez, No.
01-10-00270-CV, 2010 Tex. App. LEXIS 8453, at **19-21 (Tex. App.–Houston [1st
Dist.] Oct. 21, 2010, no pet.) (mem. op.) (rejecting the appellant’s plea for
the appellate court to go outside the four corners of the expert report and
review the medical records examined by the expert because the expert report
allegedly contradicted the findings in the medical records).  Therefore, we
must look no further than the four corners of the expert report in order to
determine whether Dr. Jones made an objective good faith effort to comply with section
74.351(r)(6).  See Palacios, 46 S.W.3d at 878; see also Hernandez,
2010 Tex. App. LEXIS 8453, at **19-21.  Furthermore, the medical records that Dr.
Pisharodi urges us to review are not included in the appellate record. 
Although he has attached these records as appendices to his brief, we cannot
consider documents attached to an appellate brief that do not appear in the
record.  See Cantu v. Horany, 195 S.W.3d 867, 870 (Tex.
App.–Dallas 2006, no pet.) (“An appellate court cannot consider documents cited
in a brief and attached as appendices if they are not formally included in the
record on appeal.”); Till v. Thomas, 10 S.W.3d 730, 733 (Tex. App.–Houston
[1st Dist.] 1999, no pet.).  We overrule Dr. Pisharodi’s first issue.

IV.       Standard of Care

            By his second issue, Dr. Pisharodi contends that
the expert report failed to identify the proper standard of care.

            In her expert report, Dr. Jones stated that it
was outside the standard of care for Dr. Pisharodi to perform the procedure in
his office using the amounts of local anesthetic and neuroaxial opiates that he
gave Lamas.  Dr. Jones stated that “[a]t minimum, anybody who is getting this
type of spinal injection should have not only fluoroscopic guidance and
contrast injected prior to the medication, but there should be an IV placed
regardless of whether IV sedation is used so that adequate resuscitation could
be provided if necessary.”  After reviewing Lamas’s medical records, Dr. Jones
documented that Dr. Pisharodi did not use fluoroscopic guidance and did not
place an IV on Lamas.  Dr. Jones concluded that Dr. Pisharodi should have
performed the procedure in accordance with “the standard of care per the
American Society of Anesthesiology guidelines.”  She then listed the guidelines
that she believed “should have been applied” by Dr. Pisharodi in accordance
with the standard of care:  (1) there would have been monitoring for respiratory
depression for a specified time; (2) IV access would have been established in
order to administer a reversal agent if needed; and (3) the reversal agent
would have been administered to any patient experiencing significant
respiratory depression after spinal opioid administration.  Finally, in her
supplemental expert report, Dr. Jones opined that Lamas’s death was caused by
an overdose of spinal morphine causing cardiopulmonary arrest that was not
properly treated, which led to anoxic brain injury.

            An expert report must “set out what care was
expected, but not given.”  Palacios, 46 S.W.3d at 880.  In this case, Dr.
Jones’s report informed Dr. Pisharodi that the proper standard of care when
performing a spinal injection of local anesthetic and opiates required him to utilize
fluoroscopic guidance, provide an IV for Lamas, and adequately treat Lamas’s
adverse reaction to the medication.  “[M]agical words” are not needed to
provide a fair summary of the standard of care.  See Bowie, 79 S.W.3d at
53.  Moreover, in determining whether the expert complied with the statute, we
consider the “substance of the opinions, not the technical words used.”  Moore
v. Sutherland, 107 S.W.3d 786, 790 (Tex. App.–Texarkana 2003, pet. denied). 
Here, the expert report provided the substance of Dr. Jones’s opinions and gave
a basis for the trial court to conclude that the appellees’ claims have merit. 
See Palacios, 46 S.W.3d at 879.  Therefore, we conclude that the trial
court did not abuse its discretion by denying Dr. Pisharodi’s motion to strike
appellees’ expert report.  Valley Baptist Med. Ctr., 198 S.W.3d at  815.
 We overrule Dr. Pisharodi’s second issue.

V.        Conclusion

            We affirm the trial court’s judgment.

                                                                                    ________________________

                                                                                    ROGELIO
VALDEZ

                                                                                    Chief
Justice

 

Delivered
and filed the

27th
day of January, 2011.









[1] The Honorable
Linda Reyna Yañez, former Justice of this Court, did not participate in this
opinion because her term of office expired on December 31, 2010; therefore, this
case will be decided by the two remaining justices on the panel.  See
Tex. R. App. P. 41.1(b) (“After
argument, if for any reason a member of the panel cannot participate in
deciding a case, the case may be decided by the two remaining justices.”).

 





[2]
In his brief, Pisharodi generally challenges appellees’ expert report because
he claims that it “failed to establish that [the patient’s] death was caused by
any conduct of [Pisharodi]” and it did not include the “causal relationship to
the death of the patient.”  However, Pisharodi has not provided briefing on the
issue of causation; therefore, to the extent that Pisharodi attempts to
challenge the expert report on the basis that it did not state causation, we
are unable to address his issue.  See Tex.
R. App. P. 38.1(i).





[3]
Fluoroscopy is “[a]n x-ray procedure that makes it possible to see internal
organs in motion.”  Definition of fluoroscopy, MedicineNet.com, available at http://www.medterms.com/script/main/art.asp?articlekey=3488
(last visited January 11, 2011).





[4]
There is nothing in the record stating who gave Dr. Pisharodi authorization to
perform the procedure on October 29, 2007.